**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2085-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LEWIS A. JOHNSON, a/k/a
LEWIS JOHSNON and
LEWIS A. JOHNSONII,

    Defendant-Appellant.

_____

Submitted January 27, 2026 – Decided July 7, 2026

Before Judges Gooden Brown and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 20-12-0720.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Samuel C. Carrigan, Assistant Deputy Public Defender, of counsel and on the briefs).

Jennifer Davenport, Acting Attorney General, attorney for respondent (Thomas R. Clark, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Following sequential trials, defendant Lewis A. Johnson was convicted of murder and related weapons offenses,[1] and sentenced to an aggregate extended term of life in prison, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The convictions stemmed from the fatal shooting of a seventeen-year-old after defendant and his girlfriend, Shaquana Lewis, visited the family home of Lewis's daughter's ex-boyfriend, J.H.[2] The shooting was fueled by a belief that Lewis's daughter, J.C., had been threatened with a gun during an argument with J.H. The victim was J.H.'s foster brother who resided at the home. The State's proofs at trial included ballistics evidence, fingerprint evidence, and eyewitness testimony.

Defendant now appeals his convictions and sentence, raising the following points for our consideration:

POINT I

IT WAS ERROR TO ALLOW THE STATE'S BALLISTICS EXPERT TO GIVE A NET OPINION ABOUT INDIVIDUAL-CHARACTERISTIC FIREARM TOOLMARK IDENTIFICATION BASED ON TESTIMONIAL HEARSAY, VIOLATING N.J.R.E. 702 AND 703. (NOT RAISED BELOW).

---

[1] Defendant was acquitted of a conspiracy charge.

[2] We use initials to protect the identity of victims of domestic violence. R. 1:38-3(c)(12).

A. There Are Real Concerns With Individual-Characteristic Firearm Toolmark Identification—The Theory Of A Unique Gun "Fingerprint"—And The State Failed To Show That The Expert Testimony Here Was The Result Of A Reliable Application Of A Reliable Methodology, Violating N.J.R.E. 702.

B. [The State's Ballistic Expert] Opinion Testimony Was A Net Opinion And Relayed Testimonial Hearsay.

C. As An Alternative To Vacating The Convictions, This Court Should Remand For An Olenowski[3] Hearing, Following The Guidance Of The Daubert[4] Factors.

POINT II

THE COURT ERRED WHEN IT FAILED TO GIVE THE COMPLETE LIMITING INSTRUCTION REGARDING PRIOR CONVICTIONS FOR DEFENDANTS. (NOT RAISED BELOW).

POINT III

THE COURT ERRED WHEN IT DENIED THE MOTION FOR A NEW TRIAL BECAUSE THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

---

[3] State v. Olenowski (Olenowski I), 253 N.J. 133 (2023).

[4] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

3

POINT IV

A SENTENCING REMAND IS NECESSARY TO CORRECT THE ERLINGER[5] VIOLATION.

Considering the arguments in light of the record and the applicable law, we affirm the convictions and sentence.

I.

Defendant was charged in a five-count Atlantic County indictment with first-degree murder, N.J.S.A. 2C:11-3(a)(1) (count one); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2(a)(1) and :11-3(a)(1) and (2) (count two); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count three); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count four); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count five). Lewis was charged in counts one and two, but pled guilty to count one, as amended to second-degree manslaughter, N.J.S.A. 2C:11-4(b)(1), and agreed to testify against defendant at trial.[6]

---

[5] Erlinger v. United States, 602 U.S. 821 (2024).

[6] Pursuant to a plea agreement, on June 27, 2023, Lewis was sentenced to an eight-year prison term, subject to NERA.

Because of the certain persons charge, the trial proceedings were bifurcated.[7] We first recount the pertinent facts from the three-day jury trial on counts one through four, between December 6 and 11, 2023, during which Lewis, J.C., J.H., and several law enforcement witnesses, including expert witnesses, testified for the State. Defendant testified on his own behalf.

Lewis testified that in the early morning hours of June 8, 2020, she received a distressed FaceTime call from J.C., her seventeen-year-old daughter. J.C. told Lewis her ex-boyfriend, J.H., had pulled a gun on her the night before. At the time, defendant and Lewis lived together in Easton, Pennsylvania,[8] while J.C. lived in Atlantic City, New Jersey.

After a "nasty" and "disrespect[ful]" "text voice message" exchange between Lewis and J.H.'s father, S.H., Lewis and defendant drove to Atlantic City, intending to first pick up J.C. and then drive to J.H.'s family's home to

---

[7] "[W]hen a defendant is charged with an additional crime beyond the certain persons offense, the trial must be bifurcated." State v. Bailey, 231 N.J. 474, 484 (2018) (citing State v. Ragland, 105 N.J. 189, 193 (1986)). "A bifurcated proceeding is necessary 'since proof that defendant was a convicted felon (required in the trial of the [certain persons] charge) clearly tends to prejudice the jury in considering the [additional charge].'" Ibid. (alterations in original) (quoting Ragland, 105 N.J. at 193).

[8] Defendant and Lewis lived in an apartment rented and occupied by a third individual.

A-2085-23

"have a conversation with" J.H.'s parents. Lewis wanted defendant to accompany her because "[S.H.] ha[d] a history of putting his hands on women." When they arrived at J.C.'s apartment, defendant and Lewis went inside to use the bathroom and then continued their trip to J.H.'s residence.

Sometime in the afternoon, the three arrived at J.H.'s residence and parked nearby. Lewis testified defendant, who was wearing a homemade COVID mask, changed out of his new shoes into "an older pair," exited the car, and walked towards the residence where S.H., his wife, J.H., and the victim lived. Lewis said she could see defendant had a gun on him as he exited the car. Lewis and J.C. remained inside the car.

About three to five minutes later, Lewis heard gunshots. J.C. promptly opened the car door and ran off. After J.C. left, Lewis saw defendant running towards the car. Upon entering the car, defendant started "pushing" Lewis, telling her to "hurry up and drive." Lewis complied and sped off.

According to Lewis, as the pair began driving back, defendant put the gun in the center console, changed back into his new shoes, and threw the old shoes out the window. After stopping at a gas station on the way, Lewis received a text from J.C. telling her the victim had been killed. The pair then drove to a liquor store. Lewis testified defendant purchased and drank "a small bottle of

6

Hennessy" and told Lewis to "[d]elete [her] Facebook" and disconnect J.C.'s phone.

When Lewis asked defendant what happened, he told her there was a "light-skinned" person and a "dark-skinned" person, and he had "shot the light-skinned one." According to Lewis, the victim had lighter skin than J.H. Defendant had never met either before. Lewis described defendant as being "happy," "overdramatic," and "excited" when he spoke about the shooting. The pair then drove back to Pennsylvania, where Lewis changed her phone number at a Boost Mobile store.

The victim was transported by ambulance to a local hospital where he was pronounced dead. The medical examiner testified the cause of death was three gunshot wounds to the "back and right foot." Stippling observed during the autopsy suggested the gun muzzle "was within about two or three feet from the skin surface when [the gun] was fired." A bullet was recovered during the autopsy.

During the ensuing investigation, law enforcement recovered shell casings and a bullet at the scene of the shooting. Using surveillance footage, officers identified a suspect vehicle and traced it to defendant's and Lewis's residence the day after the shooting. During a search of the residence, a Glock

semiautomatic handgun was recovered under a bed, next to a shoe box with two photo identification cards belonging to defendant.[9] Investigators also found a homemade black cloth mask on a coffee table in the living room.

Law enforcement tracked defendant's actions around the time of the shooting. Video footage uncovered during the investigation and played for the jury at trial showed defendant walking to the liquor store, dropping a black rag, purchasing a bottle of liquor with his T-shirt covering his face, walking out, finding the rag, and getting back into the car. Another video played for the jury showed defendant in an elevator at J.C.'s apartment wearing a black durag over his head.

Lewis testified after she and defendant were arrested and confined at the county jail, she received two letters from defendant. The first letter, which was signed with defendant's nickname, "Haddii Daddii," told Lewis, "No matter who comes to see you from now on, keep quiet, please. I'm going to handle the things I can. We sitting as long as possible. I love you." The second letter was addressed to Lewis and told her to "keep quiet" and to convince her daughter to

---

[9] Further investigation confirmed defendant had no permit for the gun.

A-2085-23

"take her statement back."[10]  According to Lewis, after she received the second letter and gave an incriminating statement to police, defendant threatened her life.

J.C.'s testimony about the shooting generally mirrored her mother's.[11]  On the day of the shooting, J.C. remembered defendant wearing a black durag wrapped around his face like a mask.  While they were parked outside of J.H.'s house, J.C. heard a gunshot and ran out of the car, towards the house.  As she

---

[10]  The second letter read as follows:

> We got this shit beat.  Spoke to my lawyer . . . . He said all the evidence is challengeable.  To my understanding, you have a pool attorney which is good.  All we need to put the nail in the coffin is an "affidavit" from ol' girl that lied on us—write ya brother to have her take her statement back [and] we good.  Stick to ya guns and we good.  [And] that's a fact.  I love you [and] remember eyes, ears open.  Mouth on zip.  Oh yeah, [and] plead "neither" when they ask guilty or innocent.  Our stories [and] words have to be the same.  My lawyer got this beat, so that means yours is beat, too.  Alhamdulillah.  Start praying too yo.  Xoxo.  No cop outs or pleas.  Shit bouta to get spanked.  Lmao (in my laugh)[.]

[11]  J.C.'s and Lewis's testimony regarding what precipitated the shooting differed.  According to J.C., J.H. had gotten upset when a friend of his attempted to talk to her.  As a result, J.H. began yelling and following her, causing J.C. to run away.  When J.H. returned to his friends, he falsely told them he had stabbed J.C.

A-2085-23

was running, she ran past defendant, who was running towards the car with a gun in his hand. When she got to J.H.'s house, she saw the victim lying face down on the porch.

J.H. gave a statement to police shortly after the shooting in which he admitted telling the police he and the victim had been smoking on the porch when he saw a man "come up the steps," "tussle" with and then shoot the victim multiple times. J.H. told police the man was "light" and had his face "wrapped up" with something that looked like a COVID mask. On cross-examination, J.H. denied knowing defendant or ever seeing him. J.H. admitted that the night before, he had an argument with J.C.

At trial, the State presented expert testimony on fingerprint and firearms toolmark identification. The State's fingerprint identification expert compared defendant's known prints with a partial latent fingerprint identified on the slide of the gun recovered from the search of defendant's residence and concluded the print on the gun "originated from [defendant's] left thumb." The finding was verified by another forensic crime scene examiner.

Detective Sergent Edward Burek, Jr. of the New Jersey State Police Ballistics Unit was responsible for ballistics identification. His role in the case was to serve as the "administrative and technical peer review" while another

A-2085-23

investigator, Randolph Toth, was "the examiner in charge."

Burek explained the goal of an investigation is to match bullets and shell casings to a specific gun in evidence, in this case, the gun recovered from Lewis's and defendant's residence. In order to do so, the investigator takes the gun out of evidence, loads it with ammunition belonging to the police, and fires it under controlled conditions. Any bullets and shell casings ejected are collected and labeled. These collected bullets and shell casings are the "test standards" used for comparison. In his role, after the lead examiner completes his investigation, Burek looks at the same evidence and, without reading Toth's report, "do[es] all the same steps [he] would as if it was [his] own investigation, with the exception of test-shooting the firearm."

Burek first described the process of bullet identification. Generally, when Burek investigates a single bullet, he looks at its "class characteristics," including looking at the "lands and grooves," weight, and caliber class of the bullet. When Burek compares two bullets, he may conclude "the two bullets . . . [were] discharged from the same firearm, . . . the two bullets were not discharged from the same firearm, [or reach an] . . . inconclusive [result or an] . . . unsuitable [result]." Inconclusive results stem from "damage to the bullet if it struck something" or "manufacturing of the barrel."

11

As part of the present investigation, Burek examined two bullets. The first bullet, labeled Item Number Five, was a "[forty] caliber class discharged total metal-jacketed bullet." It was "compared to other evidence in th[e] case, and the comparison was inconclusive." The second bullet, labeled Item Number Seven, was a "[forty] caliber class discharged metal-jacketed hollow point bullet," which was "inconclusive to Item Number [Five] and to test standards."

Burek then described the investigation of shell casings. Generally, shell casing identification involves looking "at the toolmarks left behind." Toolmarks are "impression[s] or . . . striation[s] that [were] left because [of] a harder material, such as the breech face of that firearm[,] impacting a softer material, which is the cartridge case." Specifically, Burek looks for: "[tool]marks such as the ejector . . . [and] extractor . . . [which] act as a push and pull, and . . . eject and extract that discharged cartridge from the firearm"; "firing pin drag," which leaves an impression on the shell casing; and "chamber marks on the sides of the cartridges."

As part of the investigation, Burek compared the shell casings in evidence to "test standards" and concluded that the shell casings were "discharged from the gun that was submitted in th[e] case." His conclusion rested on the "identification of the firing pin, the firing pin drag, and the firing pin aperture

12

A-2085-23

shear marks that were left behind on the shell casings."

Defendant testified on his own behalf, denying any involvement in the crimes.[12] During his testimony, defendant's account differed markedly from Lewis's and J.C.'s recollection of the events. According to defendant, on the day of the shooting, defendant was planning to drive to Atlantic City to pick up J.C. to bring her to Pennsylvania to "start a new life," when Lewis asked to accompany him. He acquiesced and let her drive so he could sleep off his previous night's Ecstasy high. He had no knowledge of any "situation" with J.H. He admitted he wore a black durag that day.

Defendant testified on the drive down, he fell asleep in the car. Besides waking up to use the bathroom when they arrived at J.C.'s apartment, defendant slept the whole time while Lewis drove. The next thing he remembered was Lewis awakening him in the parking lot of the liquor store and telling him to go get liquor. During the walk to the liquor store, he admitted to dropping his durag outside. However, defendant denied leaving the car when they were at J.H.'s residence; denied possessing a handgun during the trip; denied having any knowledge of weapons being in the house; denied handling a handgun the day

___

[12] Prior to defendant's testimony, the judge denied his motion for a judgment of acquittal pursuant to Rule 3:18-1.

of the shooting; and denied that the fingerprint found on the gun was his. He also denied writing any letters to Lewis. On cross-examination, defendant admitted to, at times, sleeping in the bed under which the gun was found.

The jury found defendant guilty of counts one, three, and four, and acquitted him of count two. In a sequential bench trial, the judge found defendant guilty of count five based on his possession of a firearm on the day of the shooting and his prior September 4, 2009 conviction for second-degree aggravated assault, in violation of N.J.S.A. 2C:12-1(b)(1), which conviction prohibited him from possessing a weapon.

After the verdict, defendant moved for a new trial pursuant to Rule 3:20-1, which motion was denied. At sentencing, the judge granted the State's motion for an extended-term sentence, finding defendant met the persistent offender criteria set forth in N.J.S.A. 2C:44-3(a). After appropriate merger, the judge sentenced defendant to life in prison on count one, subject to an eighty-five percent period of parole ineligibility pursuant to NERA,[13] a concurrent five-year term of imprisonment on count three, and a concurrent five-year term of

---

[13] Solely for the purpose of calculating the minimum term of parole ineligibility, a term of life imprisonment is deemed seventy-five years. N.J.S.A. 2C:43-7.2(b).

A-2085-23

imprisonment on count five, both subject to NERA. The judge entered a memorializing judgment of conviction on February 23, 2024, and this appeal followed.

II.

In Point I, defendant argues for the first time on appeal that it was error for the judge to permit Burek's testimony regarding firearm toolmark identification as it: (1) used an unreliable methodology under the Daubert/Olenowski[14] factors and therefore violated N.J.R.E. 702; (2) violated the net opinion rule, see N.J.R.E. 703; and (3) violated the Confrontation Clause because Burek stated "another forensic expert reviewed the toolmarks and agreed with Burek's conclusion." In the alternative, defendant seeks a remand for an Olenowski hearing.

Inasmuch as there was no objection to Burek's testimony at trial, we review for plain error, which is error that "is 'clearly capable of producing an unjust result.'" State v. Singleton, 211 N.J. 157, 182 (2012) (quoting R. 2:10-2). Under the plain error standard, "the possibility of injustice [must be] 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Taffaro, 195 N.J. 442, 454

---

[14] Daubert, 509 U.S. at 592-93; Olenowski I, 253 N.J. at 139.

(2008) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). When a defendant does not object, our Supreme Court "has held, '[T]o rerun a trial when the error could easily have been cured on request, would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.'" State v. Weston, 222 N.J. 277, 294-95 (2015) (quoting Macon, 57 N.J. at 333). Thus, "[i]t is [the] defendant's burden to demonstrate that the trial court[']s[] procedures constituted plain error." Id. at 295. In determining whether the defendant has met his burden, "we assess the overall strength of the State's case." Ibid. (internal quotation marks omitted).

First, we address defendant's reliability challenge. Defendant argues the firearm toolmark identification method Burek utilized to identify the shell casings and bullets has not been proven reliable and lacks any objective standard for verification. Specifically, defendant challenges toolmark identification that connects firearms to bullets and shell casings on the basis of "individual characteristics" or unique marks etched onto bullets and shell casings fired from a specific firearm.

N.J.R.E. 702 provides the foundation for the admissibility of expert testimony, addressing the qualifications of the expert and the helpfulness of the expertise to the jury as follows: "If scientific, technical, or other specialized

knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

To satisfy the rule, expert testimony must meet the following criteria:

> (1) the subject matter of the testimony must be "beyond the ken of the average juror"; (2) the field of inquiry "must be at a state of the art such that an expert's testimony could be sufficiently reliable"; and (3) "the witness must have sufficient expertise to offer the" testimony.
>
> [Olenowski I, 253 N.J. at 143 (emphasis omitted) (quoting State v. J.L.G., 234 N.J. 265, 280 (2018)).]

Olenowski I adopted the standard for scientific reliability in criminal cases as set forth in Daubert and rejected the formerly applied "generally accepted" Frye[15] paradigm. Id. at 139. The Daubert standard requires a trial court reviewing a proffer of expert scientific testimony to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Olenowski I, 253 N.J. at 147 (emphasis omitted) (quoting Daubert, 509 U.S. at 592-93).

---

[15] Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923).

17

In so holding, Olenowski I outlined four "non-exclusive" factors identified in Daubert to assist the trial court in making the assessment:

> (1) whether the scientific theory or technique can be, or has been, tested; (2) whether it "has been subjected to peer review and publication"; (3) "the known or potential rate of error" as well as the existence of standards governing the operation of the particular scientific technique; and (4) general acceptance in the relevant scientific community.
>
> [Olenowski I, 253 N.J. at 147 (quoting Daubert, 509 U.S. at 593-94).]

"The Court emphasized the inquiry is 'a flexible one' and that its 'focus . . . must be solely on principles and methodology, not on the conclusions that they generate.'" Ibid. (omission in original) (quoting Daubert, 509 U.S. at 594-95).

Generally, toolmark analysis of all kinds "is not a newcomer to the courtroom. . . . [and t]estimony by tool[]mark experts has been admitted in New Jersey courts without objection." State v. McGuire, 419 N.J. Super. 88, 130 (App. Div. 2011). Indeed, "[b]ecause of their uniqueness, a firearm's individual characteristics make firearm identification possible, so long as the toolmarks imparted are 'reproducible for comparisons.'" State v. Ghigliotty, 463 N.J. Super. 355, 362 (App. Div. 2020) (quoting Robert M. Thompson, Nat'l Dist. Att'ys Ass'n, Firearm Identification in the Forensic Science Laboratory 7-9 (2010)).

18

"For the science of toolmark identification, the underlying hypothesis is that a toolmark can be identified to a specific tool that produced it, to the practical exclusion of all other tools." Thompson, at 9-10. Although it is impossible to prove the hypothesis "by testing all tools ever produced in the world," firearms examiners make identifications "based on observation and experimentation" which includes the consideration of "known non-match" toolmark comparisons. Id. at 10.

The science of firearm and toolmark identification is well-established, spanning over [one hundred] years in the United States. Id. at 8. "There is a foundation of knowledge about firearm and toolmark identification that has been organized over time and is described in forensic textbooks, scientific literature, reference material, training manuals, and peer reviewed scientific journals." Id. at 28-29. The Association of Firearm and Toolmark Examiners (AFTE), an international body of practitioners, is the largest professional organization in the field and publishes a professional journal concerning firearm and toolmark science. Id. at 11, 29.

Neither the underlying principles nor the methodology has changed significantly during the last 100 years. Id. at 8. The AFTE recognizes that the "most widely accepted method used in conducting a toolmark examination is a side-by-side, microscopic comparison of the markings on a questioned material item to known source marks imparted by a tool." President's Council of Advisors on Sci. and Tech., Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods 104 (2016) [hereinafter PCAST Report]. A firearms toolmark examiner uses a comparison microscope to compare toolmarks on an evidence bullet with

19

toolmarks present on a test[-]fired bullet from the suspected weapon that is linked to either the crime scene or a suspect. Thompson, at 10, 27. Class characteristics are evaluated first, followed by individual characteristics. Id. at 26-27; Comm. on Identifying the Needs of the Forensic Scis. Cmty., Nat'l Rsch. Council, Strengthening Forensic Science in the United States: A Path Forward 152-53 (2009); PCAST Report at 11, 104.

. . . .

When an examiner finds that the toolmarks on an evidence bullet and a test bullet fired from the suspected weapon are in "sufficient agreement," a firearm identification can be made. Thompson, at 9-10, 26. "[T]he final determination of a match is always done through direct physical comparison of the evidence by a firearms examiner, not the computer analysis of images." Comm. on Identifying the Needs of the Forensic Scis. Cmty., at 153.

In 1992, the AFTE adopted a "Theory of Identification" and standardized the terms and conclusions that firearms examiners should use to describe examination results. Thompson, at 11. Revised in 2011, the Theory of Identification recognizes that identification is "subjective in nature" and defines and explains the "sufficient agreement" standard used by examiners[.]

. . . .

Based on its Theory of Identification, the AFTE developed four potential conclusions for examiners to make following an investigation: (1) identification; (2) inconclusive; (3) elimination; and (4) unsuitable,

20

> meaning that the evidence was not suited for examination. Thompson, at 11-12.
>
> . . . .
>
> As of 2010, the error rate in actual casework had not been studied or determined. Thompson, at 29. However, "reviews of proficiency testing data show[ed] that the error rate for misidentifications for firearm evidence is approximately 1.0%, and for toolmark evidence it is approximately 1.3%." Ibid. An individual examiner's error rate should be considered in each case. Ibid.
>
> [Ghigliotty, 463 N.J. Super. at 362-65 (third alteration in original) (citations reformatted).]

Relying, in part, on the PCAST Report cited in Ghigliotty, defendant claims individual characteristic toolmark identification is too subjective to be reliable. Defendant also relies on a 2009 report from the National Research Council of the National Academy of the Sciences (NAS Report),[16] titled "Strengthening Forensic Science in the United States: A Path Forward," which purportedly states toolmark identification lacks "any meaningful scientific validation, determination of error rates, or reliability testing to explain the limits

---

[16] Comm. on Identifying the Needs of the Forensic Scis. Cmty., Nat'l Rsch. Council, Strengthening Forensic Science in the United States: A Path Forward (2009).

A-2085-23

of the discipline."[17]  According to defendant, because the jury was "never informed of the potential for error in firearms identifications," the testimony "violat[ed] the reliability requirement of N.J.R.E. 702."

In response to the defendant's challenge to toolmark analysis generally, in McGuire, we considered the NAS Report and characterized the conclusions in the document as follows:

> It contains some criticism of tool[]mark analysis, including lack of information about variances among individual tools, lack of a clearly defined process, and a limited scientific base of knowledge.  But the NAS [R]eport does not label the discipline "junk science."  It acknowledges that tool[]mark analysis can be helpful in identifying a class of tools, or even a particular tool, that could have left distinctive marks on an object.  The report concludes that development of a precisely specified and scientifically justified testing protocol should be the goal of tool[]mark analysis.
>
> . . . [T]he purpose of the NAS [R]eport is to highlight deficiencies in a forensic field and to propose improvements to existing protocols, not to recommend against admission of evidence.
>
> [McGuire, 419 N.J. Super. at 131-32 (citations omitted).]

---

[17]  Defendant also refers to a second 2008 NAS report; however, the second report's findings were referenced and integrated into the 2009 report.

A-2085-23

Similarly, the PCAST Report is written with the purpose to "highlight deficiencies . . . and to propose improvements to existing protocols, not to recommend against admission of evidence." McGuire, 419 N.J. Super. at 132. The PCAST Report does point out limitations in the field of ballistic toolmark analysis, criticizing the lack of appropriate studies showing that "examiners can . . . associate ammunition with the gun from which it was fired." PCAST Report, at 111. However, the report is not a condemnation of the reliability of ballistic toolmark analysis to the point where permitting the testimony was "clearly capable" of producing an unjust result.[18]

Notably, the State's case did not rely solely on Burek's testimony connecting the shell casings found at the scene to the gun found in defendant's residence. The State presented eyewitness testimony from Lewis and J.C., both of whom testified they were present with defendant shortly before and shortly

---

[18] Defendant also contends the State's failure to inform the jury of the potential for error in firearms identification violated the reliability requirement of N.J.R.E. 702. Relevantly, Olenowski II suggests firearms toolmark identification is only "sufficiently reliable to be admitted with appropriate restrictions and limitations." See State v. Olenowski (Olenowski II), 255 N.J. 529, 609 n.44 (2023). However, defendant had the opportunity to cross-examine Burek on error rates. Remanding for a new trial would encourage defendants to "game the system" by remaining silent and then seeking post-conviction relief. Further, reported error rates in studies is approximately 1% to 1.3%. Ghigliotty, 463 N.J. Super. at 365. This number is not significant enough to conclude a jury would clearly rule differently if it had heard the error rate.

A-2085-23

after the shooting.  The State also presented video footage showing defendant wearing a black durag accompanied by J.C. and Lewis the day of the shooting. The State further presented fingerprint evidence placing defendant in possession of the gun recovered at his residence.  Because there was compelling evidence of defendant's guilt, the inclusion of Burek's testimony is insufficient to "raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached."  Taffaro, 195 N.J. at 454.  Accordingly, we discern no plain error in permitting Burek's testimony.

Next, we address the alleged violation of the net opinion rule. Specifically, defendant argues Burek failed to explain how he arrived at his "conclusion that the shell casings found at the scene of the shooting came from the gun found where [defendant] was staying," rendering his testimony an inadmissible net opinion under N.J.R.E. 703.

N.J.R.E. 702 and 703 together govern the admissibility of expert testimony.  Townsend v. Pierre, 221 N.J. 36, 53 (2015).  While N.J.R.E. 702 addresses the scope, N.J.R.E. 703 addresses the foundation of the expert testimony, providing that

> [t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the proceeding.  If of a type reasonably relied upon by

experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

"The net opinion rule, a corollary of N.J.R.E. 703, 'forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" State v. Burney, 255 N.J. 1, 23 (2023) (quoting Townsend, 221 N.J. at 53-54). "The rule requires that an expert 'give the why and wherefore that supports the opinion[] rather than a mere conclusion.'" Townsend, 221 N.J. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)) (internal quotation marks omitted). As such, "[a] court must ensure that the proffered expert does not offer a mere net opinion." Burney, 255 N.J. at 23 (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)).

The Townsend Court provided the following specific guidance on the subject:

> The net opinion rule is not a standard of perfection. The rule does not mandate that an expert organize or support an opinion in a particular manner that opposing counsel deems preferable. An expert's proposed testimony should not be excluded merely "because it fails to account for some particular condition or fact which the adversary considers relevant." Creanga v. Jardal, 185 N.J. 345, 360 (2005) (quoting State v. Freeman, 223 N.J. Super. 92, 116 (App. Div. 1988)). The expert's failure "to give weight

25

to a factor thought important by an adverse party does not reduce [the expert's] testimony to an inadmissible net opinion if he [or she] otherwise offers sufficient reasons which logically support [an] opinion." Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002) (citing Freeman, 223 N.J. Super. at 115-16). Such omissions may be "a proper 'subject of exploration and cross-examination at a trial.'" Ibid. (quoting Rubanick v. Witco Chem. Corp., 242 N.J. Super. 36, 55 (App. Div. 1990), modified on other grounds, 125 N.J. 421 (1991)); see also State v. Harvey, 151 N.J. 117, 277 (1997) (Handler, J., dissenting) ("[A]n expert witness is always subject to searching cross-examination as to the basis of his [or her] opinion." (quoting State v. Martini, 131 N.J. 176, 264 (1993), overruled on other grounds by State v. Fortin, 178 N.J. 540 (2004))).

[Townsend, 221 N.J. at 54-55 (fourth alteration in original) (citations reformatted) (internal quotation marks omitted).]

Here, Burek's conclusion that the shell casings retrieved from the crime scene came from the gun found in defendant's residence was derived from his personal examination and review of the evidence in the case. Burek testified that although he did not personally shoot the gun, as he was the "peer review" and not the "examiner in charge," he had "all [of] the evidence in front of [him]," including the gun. He testified to the process the "examiner in charge" utilized to shoot the gun to create the "test standards" he then examined to reach his conclusion.

A-2085-23

Next, Burek generally testified as to how a firearm works, and how the "ejector," "extractor," and "firing pin" of a firearm leave an "impression or a striation" on a discharged shell casing. Regarding his conclusion, Burek testified he specifically identified a match in "the firing pin, the firing pin drag, and the firing pin aperture shear marks that were left behind on the shell casings from the submitted pistol" when comparing the test standards to the recovered shell casings.

Burek's testimony was not a "mere conclusion," rendering his testimony a net opinion "clearly capable of producing an unjust result." Townsend, 221 N.J. at 54; R. 2:10-2. In addition, Burek's testimony was subject to cross-examination by defense counsel, and, in turn, acceptance or rejection by the jury. We therefore discern no plain error in Burek's testimony.

We next address defendant's Confrontation Clause challenge. Defendant argues Burek's testimony that "another forensic expert reviewed the toolmarks and agreed with his conclusion" constituted impermissible hearsay.

"The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee that, in a criminal trial, the accused has the right to be confronted with the witnesses against him [or her]." State v. Williams, 219 N.J. 89, 98 (2014) (internal quotation marks

omitted). To that end, "[t]he Confrontation Clause 'prohibit[s] the use of out-of-court testimonial hearsay, untested by cross-examination, as a substitute for in-court testimony.'" Ibid. (second alteration in original) (emphasis omitted) (quoting State in the Int. of J.A., 195 N.J. 324, 342 (2008)).

Nonetheless,

> [t]he right of confrontation, like other constitutional rights, may be waived by the accused. The Constitution does not compel a criminal defendant to insist that the State call a live witness who might do damage to his [or her] case. See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 328 (2009) ("It is unlikely that defense counsel will insist on live testimony whose effect will be merely to highlight rather than cast doubt upon the forensic analysis."). Defense counsel, many times as a matter of trial strategy, will refrain from objecting to hearsay that may inure to the advantage of the defendant. Because counsel and the defendant know their case and their defenses, they are in the best position to make the tactical decision whether to raise a Confrontation Clause objection. See United States v. Moon, 512 F.3d 359, 361 (7th Cir. 2008) ("That it may be to defendants' advantage to accept the hearsay version of evidence makes it problematic to entertain a Crawford[19] claim via the plain-error [standard] . . . ."), cert. denied, 555 U.S. 812 (2008); State v. Nyhammer, 197 N.J. 383, 413-14 (finding no Confrontation Clause violation where defendant chose "strategic course" not to cross-examine victim about accusations in videotaped interview), cert. denied, 558 U.S. 831 (2009).

---

[19] Crawford v. Washington, 541 U.S. 36 (2004).

28

It therefore makes perfect sense that "[t]he defendant always has the burden of raising [a] Confrontation Clause objection." Melendez-Diaz, 557 U.S. at 327; see also United States v. Maxwell, 724 F.3d 724, 728 (7th Cir. 2013) ("[T]he strategic decision to demand live testimony is the defendant's choice to make, and one that many defendants . . . opt to forego—sometimes for good reasons."). It is the defendant's choice "to assert (or forfeit by silence) [the] Confrontation Clause right." Melendez-Diaz, 557 U.S. at 326.

[Williams, 219 N.J. at 98-99 (omissions and third fourth, and sixth alterations in original) (emphasis omitted) (citations reformatted).]

In Williams, defense counsel declined to object when the State offered a forensic pathologist to testify on behalf of another pathologist's autopsy report. Id. at 100-01. Accordingly, the expert was permitted to testify that through his review of the other expert's report who performed the autopsy, he "was able to reach independent conclusions about both the manner and cause of" death. Id. at 96. The Court held that the defendant's failure to object constituted a waiver of his right to confrontation and was perhaps attributable to defense strategy, or, at a minimum, barred by the invited error doctrine. Id. at 99-101. The Court therefore "decline[d] to address the merits of [the] defendant's Confrontation Clause arguments." Id. at 101. Applying those principles, we reach the same

conclusion here and decline to address the merits of defendant's Confrontation Clause claim.[20]

### III.

In Point II, defendant argues the judge's failure to "include critical language from the [M]odel [J]ury [C]harge instructing jurors that they may not conclude that a defendant committed the crime being tried based on his prior convictions" when giving a limiting instruction about defendant's prior convictions warrants reversal.

Because defendant failed to object during trial and raises this issue for the first time on appeal, we again review for plain error. See R. 2:10-2; State v. Adams, 194 N.J. 186, 206-07 (2008) ("Generally, a defendant waives the right to contest an instruction on appeal if [the defendant] does not object to the instructions as required by Rule 1:7-2."). Plain error in a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and

---

[20] It is also notable that the alleged hearsay was elicited by defense counsel on cross-examination. In any event, "[a]t present, our case law permits . . . a single, or even substitute, witness to testify and explain the results of an out-of-court data analysis, when the individual can 'provide the independent verification of the data and results.'" State v. Carrion, 249 N.J. 253, 271 (2021) (quoting State v. Bass, 224 N.J. 285, 319 (2016)) (internal quotation marks omitted).

to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Camacho, 218 N.J. 533, 554 (2014) (alteration in original) (quoting Adams, 194 N.J. at 207).

"Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for rehabilitation under the plain error theory.'" Adams, 194 N.J. at 207 (quoting State v. Jordan, 147 N.J. 409, 422 (1997)). Still, if a defendant does not object when a charge is given, as here, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Montalvo, 229 N.J. 300, 320 (2017) (quoting State v. Singleton, 211 N.J. 157, 182 (2012)); see State v. Walker, 203 N.J. 73, 90 (2010) ("The error must be considered in light of the entire charge and must be evaluated in light 'of the overall strength of the State's case.'" (quoting State v. Chapland, 187 N.J. 275, 289 (2006))).

During the final charge, the judge gave the jury limiting instructions on the use of prior convictions. Both defendant and J.H. had prior convictions that were raised during their respective testimonies. As to J.H., the judge issued a limiting instruction closely mirroring the Model Jury Charge for prior convictions of a witness. See Model Jury Charges (Criminal), "Credibility – Prior Conviction of a Witness" (rev. Feb. 24, 2003).

31

As to defendant, the judge gave the following limiting instruction:

> I did give an instruction that we had certain witnesses who testified who had prior convictions. The same instruction applies to . . . defendant. He testified, and as you heard, that . . . defendant . . . has been previously convicted of crimes. That evidence, again, may only be used for determining the credibility or believability of his testimony. The jury has a right to consider whether a person who has previously failed to comply with society's rules, as demonstrate[d] through a criminal conviction, would be more likely to ignore the oath requiring truthfulness on the stand as a witness as compared to a person who has never been convicted of a crime. You may consider . . . in determining this issue, the nature and the degree of the prior convictions, and when they occurred. All right, so the instructions apply to the witness and to . . . defendant.

Defendant's argument pertains to the omission of the following portion of the jury charge from the judge's instruction: "You may not conclude that the defendant committed the crime charged in this case or is more likely to have committed the crime charged simply because he/she committed a crime on another occasion." See Model Jury Charges (Criminal), "Credibility – Prior Conviction of a Defendant" (rev. Feb. 24, 2003). We are not convinced the judge's inadvertent failure to recite the omitted portion of the charge in relation to defendant's prior convictions rises to the level of plain error.

We acknowledge that "[t]rial courts are expected to 'explain carefully the limited purpose of prior conviction evidence' in order to reduce 'the danger that

32

a jury might improperly use a prior conviction as evidence of the defendant's criminal propensity.'"  State v. Hamilton, 193 N.J. 255, 265 (2008) (quoting State v. Sands, 76 N.J. 127, 142 n.3 (1978)).  However, "portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect."  State v. Wilbely, 63 N.J. 420, 422 (1973).

Reading the entire charge as a whole, we are satisfied the judge's error did not "possess[] a clear capacity to bring about an unjust result."  Camacho, 218 N.J. at 554.  The concept conveyed in the omitted portion of the charge was generally encompassed in the charge as a whole.  As such, the judge's failure to include the sentence was not "sufficiently grievous" to obscure the meaning of the charge to the jury.  Cf. State v. Pierce, 330 N.J. Super. 479, 489 (App. Div. 2000) (holding a trial court's "truncated" version of the Model Jury Charge on identification was plain error as it was "insufficient to focus the jury on the particular credibility issue of eyewitness identification central to the proper determination of th[e] case").

IV.

In Point III, defendant argues the judge erred in denying his motion for a new trial pursuant to Rule 3:20-1 as the verdict "was against the weight of the evidence." We disagree.

Rule 3:20-1 directs that a trial court may not set aside a jury verdict as against the weight of the evidence "unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law." Under Rule 2:10-1, a trial court's ruling on a motion for a new trial "shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law."

We have stated that

> [a] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown. Our scope of review is limited to a determination of "whether the findings made by the trial court could reasonably have been reached on sufficient credible evidence present in the record." Moreover, we will "give deference to the trial judge's feel for the case since he [or she] presided over [it] . . . and had the opportunity to observe and hear the witnesses as they testified."

A-2085-23

[State v. Brooks, 366 N.J. Super. 447, 454 (App. Div. 2004) (third alteration in original) (quoting State v. Russo, 333 N.J. Super. 119, 137 (2000)).]

In denying the motion, the judge found substantial and persuasive evidence supporting the verdict. In rendering his decision, the judge relied on the "eyewitness[] [testimony], . . . the ballistics [testimony], . . . and the fingerprint evidence." The judge's decision is amply supported by the evidence. The State proffered eyewitness and expert testimony tying defendant to the scene of the crime and implicating defendant in the shooting. Defendant urges us to adopt competing inferences from the evidence. However, "[i]t is the jury's function, not [the court's], to evaluate 'the credibility of witnesses and the weight and worth of evidence.'" State v. Scott, 236 N.J. Super. 264, 268 (App. Div. 1989) (quoting State v. Ingenito, 87 N.J. 204, 211 (1981)). We find no basis to disturb the judge's decision.

## V.

In Point IV, defendant challenges his sentence and requests a remand in light of Erlinger/Carlton[21] as the judge, rather than a jury, found the factual

---

[21] Erlinger, 602 U.S. at 835; State v. Carlton, 262 N.J. 629 (2026). In his merits brief, defendant cites our decision in State v. Carlton, 480 N.J. Super. 311 (App. Div. 2024), which was reversed in Carlton, 262 N.J. 629, after the brief was

35

predicates for defendant to qualify for an extended term sentence pursuant to N.J.S.A. 2C:44-3(a).[22] On remand, defendant argues "the sentencing court must . . . reconsider finding . . . mitigating factor [four]," N.J.S.A. 2C:44-1(b)(4), and "provide a statement of the overall fairness of the sentence consistent with State v. Torres[,] 246 N.J. 246, 272 (2021)."

In Erlinger, 602 U.S. at 834-35, the United States Supreme Court held a defendant is entitled under the Fifth and Sixth Amendments to have a jury unanimously determine, beyond a reasonable doubt, whether the defendant's past offenses were "committed on occasions different from one another" under the federal Armed Career Criminal Act, 18 U.S.C. § 924(e). The Erlinger majority, applying principles first announced in Apprendi v. New Jersey, 530

---

filed. The State thereafter filed an additional citation letter under Rule 2:6-11(d).

[22] N.J.S.A. 2C:44-3(a) provides that a court may sentence a defendant who commits a first-, second-, or third-degree crime when he is twenty-one or older to an extended term of imprisonment as a persistent offender if the defendant

> has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he [or she] was at least [eighteen] years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within [ten] years of the date of the crime for which the defendant is being sentenced.

U.S. 466 (2000), reiterated "there is no doubt what the Constitution requires in these circumstances: Virtually 'any fact' that 'increase[s] the prescribed range of penalties to which a criminal defendant is exposed' must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." Erlinger, 602 U.S. at 834 (alteration in original) (quoting Apprendi, 530 U.S. at 490) (internal quotation marks omitted).

It is undisputed that Erlinger abrogated New Jersey's persistent offender statute to the extent N.J.S.A. 2C:44-3(a), as presently drafted, provides certain predicate facts are to be found by a court rather than a jury. The critical issue presented to our Supreme Court in Carlton was whether a violation of the Erlinger rule could be harmless constitutional error. The Court concluded that "errors in failing to submit sentencing factors or elements to a jury, as in Apprendi and its progeny, are presumptively subject to harmless error analysis, not automatic reversal." Carlton, 262 N.J. at 643.

The Court further held that before a constitutional error can be considered harmless, the reviewing court must be convinced beyond a reasonable doubt the error did not affect the sentencing outcome. Id. at 642. Stated another way, the record must provide meaningful appellate review and demonstrate that only one

37

outcome would have been possible had the defendant's eligibility for an extended-term sentence been presented to a jury. Id. at 645.

Thus, the Court held the harmless constitutional error doctrine applies to Erlinger violations provided "the relevant facts are undisputed, the sentencing court's reasoning fully articulated, and the record demonstrates, beyond any reasonable doubt, the sole conclusion a jury could have reached had Erlinger been in place at the time of sentencing." Id. at 644. Applying that test, the Court found the constitutional error in Carlton harmless beyond a reasonable doubt. Id. at 645.

Here, at sentencing, the State produced evidence defendant, born September 1988, was convicted of six crimes committed on six separate dates, each when he was eighteen or older:

(1) On June 22, 2007, defendant was sentenced to five years' probation for third-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5, occurring in Pleasantville Township on December 4, 2006. On October 31, 2009, defendant was resentenced to a five-year term of incarceration based on his violation of the conditions of probation;

(2) Defendant was sentenced[23] to five years' probation for third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4, occurring in Pleasantville Township on July 11, 2007. On October 31, 2008, defendant was re-sentenced to a four-year term of imprisonment based on his violation of the conditions of probation;

(3) On September 4, 2009, defendant was sentenced to a five-year term of imprisonment for aggravated assault with serious bodily injury, N.J.S.A. 2C:12-1(b)(1), occurring in Galloway Township on September 20, 2008. He was paroled on December 3, 2013, but reincarcerated after a parole violation on July 23, 2014;

(4) On November 21, 2014, defendant was sentenced to a five-year term of imprisonment, with five years of parole ineligibility, for certain persons not to have weapons, N.J.S.A. 2C:39-7, occurring in Atlantic City on June 2, 2014;

(5) On November 21, 2014, defendant was sentenced to an eight-year term of imprisonment for unlawful possession of a handgun with a prior NERA conviction, N.J.S.A. 2C:39-5, and certain persons not to have weapons, N.J.S.A. 2C:39-7, occurring in Absecon Township on July 23, 2014;

---

[23] It is unclear when defendant was sentenced, as the sentencing date on defendant's presentence report lists a sentencing date prior to the date of the commission of the offense.

(6) On November 21, 2014, defendant was sentenced to an eighteen-month term of incarceration for aggravated assault on a law enforcement officer, N.J.S.A. 2C:12-1(5)(a), and certain persons not to have weapons, N.J.S.A. 2C:39-7, occurring in Hamilton Township on July 24, 2014.

Defendant does not dispute the validity or accuracy of the predicate facts presented by the State. In fact, at sentencing, defense counsel conceded defendant "may be technically a persistent offender." After detailing the convictions, the judge found:

> [B]ased upon the criminal history I just recited, he does . . . meet the criteria for extended term. I am going to grant the State's motion. But, again, I think it's really a distinction without a difference because murder is its own category. Murder is [thirty] to life, it's a NERA violation, falls under the NERA statute, and elevating the floor in this case is not really going to change anything. So, the State's motion being granted from a [thirty] to a [thirty-five] for the floor is really de minimis against what we're talking about here, but it is granted.

Applying the Carlton harmless-constitutional-error rule, we conclude the State established beyond any reasonable doubt defendant met the criteria for a persistent offender as defined in N.J.S.A. 2C:44-3(a), and the sole conclusion a jury could have reached was that defendant was eligible to be sentenced to an extended term. We acknowledge the judge did not provide overtly detailed

40

reasoning in granting the motion. However, the record indisputably establishes the judge's eligibility finding was correct and was the only possible outcome a jury considering that evidence could have reached. Accordingly, as in Carlton, the Erlinger violation in this case was harmless constitutional error.

We also reject defendant's argument he is entitled to consideration of mitigating factor four in the imposition of sentence. See N.J.S.A. 2C:44-1(b)(4) ("There were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense.").

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless[:] (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (second alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Here, the judge found aggravating factors three, six, and nine based on the high risk of re-offense, the extent and seriousness of defendant's prior criminal

history, and the significant need for specific and general deterrence. See N.J.S.A. 2C:44-1(a)(3), (6), (9). The judge found no mitigating factors and noted that "none were submitted." The judge considered whether consecutive or concurrent sentences were warranted and concluded concurrent sentences were appropriate. We discern no abuse of discretion in the judge's sentencing decision and are satisfied the judge's rejection of mitigating factor four is supported by the record.

Although defendant argues for the first time on appeal that his drug and alcohol use implicated mitigating factor four, at sentencing, defendant denied any mental health diagnosis or chronic health issues. Moreover, the judge considered defendant's childhood and upbringing, which defendant described in his presentence report as "fair" and "stable." As such, any argument that defendant's childhood may have contributed to "excus[ing] or justify[ing]" defendant's conduct was considered and properly rejected by the judge.

Equally unavailing is defendant's contention that a statement consistent with Torres is needed. In Torres, our Supreme Court directed that to foster consistency and facilitate "appellate review of lengthy consecutive sentences," sentencing courts should provide an "explanation of the overall fairness of a

sentence." 246 N.J. at 271-72. Here, the judge did not impose consecutive sentences.

Nonetheless, the judge provided a statement consistent with <u>Torres</u>, stating:

> The Court is satisfied that the sentence is fair and in the interest of justice. . . . [D]efendant is [thirty-five] years old. This is his seventh indictable conviction. This is also his fifth conviction involving weapons of various types. . . .
>
> . . . .
>
> His prior sentences have failed to deter him. Even when paroled, during prior sentences, he violated parole and had to be re-sentenced to State [p]rison. The present conviction for first[-]degree murder illustrates that defendant's criminality continues to escalate, notwithstanding his prior sentences, and he remains a danger to the community.
>
> . . . .
>
> After the murder, . . . defendant's first stop was to a liquor store to purchase a bottle of Hennessy after killing a [seventeen]-year-old.
>
> . . . .
>
> Defendant was unremorseful and appeared to celebrate his actions, illustrating his continued dangerousness and lack of apathy.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M. C. Harley*

Clerk of the Appellate Division

A-2085-23